[Cite as *Cleveland v. Hyppolite*, 2016-Ohio-7399.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 103955**

## CITY OF CLEVELAND

PLAINTIFF-APPELLEE

vs.

## JOANNE HYPPOLITE

DEFENDANT-APPELLANT

**JUDGMENT:**
AFFIRMED

Criminal Appeal from the
Cleveland Municipal Court
Case No. 2014 TRC 066020

**BEFORE:** Jones, A.J., E.A. Gallagher, J., and Stewart, J.

**RELEASED AND JOURNALIZED:** October 20, 2016

**ATTORNEY FOR APPELLANT**

Patrick D. Quinn
Quinn Legal Associates Inc.
7580 Sherman
Gates Mills, Ohio 44040

Ronald A. Annotico
55 Public Square, Suite 1717
Cleveland, Ohio 44113


**ATTORNEYS FOR APPELLEE**

Barbara A. Langhenry
City of Cleveland Law Director

BY: Jennifer M. Kinsley
Assistant County Prosecutor
The Justice Center, 9th Floor
1200 Ontario Street
Cleveland, Ohio 44113

LARRY A. JONES, SR., A.J.:

{¶1} Defendant-appellant Joanne Hyppolite ("Hyppolite") appeals the judgment of the Cleveland Municipal Court denying her motion to suppress, which was rendered after a hearing. We affirm the judgment and remand the case to the trial court for execution of sentence.

**Suppression Hearing Testimony**

{¶2} The sole witness at the suppression hearing was Trooper Timothy Kay ("Trooper Kay") of the Ohio State Highway Patrol. The defense stipulated to the trooper's training and experience, which, according to the trooper, since 2014, has involved almost 200 arrests for operating a vehicle under the influence of alcohol ("OVI").

{¶3} On Tuesday, December 22, 2015, shortly after 2:00 a.m., Trooper Kay stopped a vehicle being driven by Hyppolite on Interstate 90 in Cleveland. According to the trooper, Hyppolite was stopped for violating R.C. 4511.213, which sets forth a driver's "duties upon approaching stationary public safety, emergency, or a road service vehicle displaying flashing lights."

{¶4} Trooper Kay testified that immediately prior to stopping Hyppolite's vehicle, he was engaged in a traffic stop involving another motorist. When he stopped that

motorist, Trooper Kay had his police cruiser parked so that it was partially in the right hand lane of travel. The trooper testified that as he was walking back to his cruiser from the motorist's car, he saw a car being driven in his direction, in the right lane where his cruiser partially was, and assumed the driver was going to move over as she approached him. According to Trooper Kay, the traffic at that time was light and the driver would have been able to move over.

{¶5} Trooper Kay got back into his cruiser and was finishing up his paperwork from the stop of the first motorist when the on-coming vehicle, driven by Hyppolite, traveled past him in the right-hand lane where he had previously seen it. The trooper testified that not only did Hyppolite fail to move over, she also did not slow down, and when she drove past his cruiser, it shook. According to the trooper, his overhead lights were still activated when Hyppolite drove past him. Trooper Kay stopped Hyppolite based on her failure to move over or slow down. A dashboard camera inside the trooper's cruiser recorded the stop of the first motorist, including when Hyppolite passed the cruiser, as well as the traffic stop involving Hyppolite. The video was played by the city during its case and was admitted into evidence.

{¶6} Hyppolite had a front-seat passenger, and Trooper Kay testified that, upon approaching the vehicle, the passenger initially did most of the talking while Hyppolite looked down. Trooper Kay asked Hyppolite for her driver's license, and she complied, giving him a Florida license. According to the trooper, when Hyppolite did talk, her speech was slow and slurred. She also had blood-shot, glassy eyes. She told the

trooper that she was headed to her home in Elyria. On direct examination by the city, the trooper testified that he also detected an odor of alcoholic beverage coming from inside the vehicle.

{¶7} Trooper Kay testified that based on the "totality of the circumstances" — which he identified as (1) the reason for the traffic stop, (2) an odor of alcohol coming from inside the vehicle, (3) Hyppolite's slow, slurred speech and blood shot, glassy eyes, and (4) the Florida driver's license — he ordered Hyppolite out of the vehicle to perform field sobriety tests. He performed the following tests: (1) the horizontal gaze nystagmus ("HGN") test/vertical gaze nystagmus ("VGN") test, (2) the walk and turn test, (3) the one leg stand test, and (4) the alphabet test. The trooper testified that he performed the tests in accordance with the National Highway Safety Administration's ("NHTSA") standards, on which he receives yearly training. He also testified that he has had "more in-depth" training on standardized field sobriety tests through advanced roadside impaired driving training he has completed.

{¶8} The trooper found that Hyppolite did not exhibit any of the clues of intoxication of the VGN test, but exhibited all six of the possible clues of intoxication of the HGN test. After those two tests, he asked Hyppolite if she had been drinking, to which Hyppolite responded that she had had three shots of "Crown Royal." Trooper Kay then administered the other tests.

{¶9} In regard to the walk and turn test, the trooper testified that Hyppolite exhibited four of the eight possible clues of intoxication, and on the one leg stand test, she

exhibited three of the four possible clues of intoxication. In regard to the alphabet test, Trooper Kay asked Hyppolite to recite the alphabet starting with D through Q. Hyppolite responded by reciting the alphabet, E through Z. She tried again, and again went to Z. She attempted to try a third time, but Trooper Kay terminated the test and arrested her. Hyppolite was transported to a State Highway Patrol post, and asked to submit to a breath test, which she agreed to. She did not pass the test and was charged with OVI.

{¶10} The defense declined to cross-examine Trooper Kay. Rather, after the city rested its case, the defense called the trooper in its case as if on cross-examination. According to Hyppolite, this was done as a "tactical strategy to get the [city] to rest its case without introducing the NHTSA manual into evidence or asking the Court to take judicial notice of the manual."

{¶11} The trooper testified that when he conducts field sobriety tests he does so from memory, based on his training and experience; he does not have the NHTSA manual or a "cheat sheet" with him.

{¶12} Trooper Kay admitted that when Hyppolite's car passed him he did not know what speed it was traveling and he did not witness any other erratic driving on Hyppolite's part. Further, the trooper admitted that his police report indicated that he smelled the odor of alcohol after he ordered Hyppolite out of the vehicle.

{¶13} After the suppression hearing, the trial court denied Hyppolite's motion to suppress. Hyppolite requested findings of fact and conclusions of law, which the court

issued. Hyppolite pleaded no contest to the charges against her, and the trial court found her guilty. The court sentenced her; the sentence has been stayed pending this appeal.

**Assignments of Error**

{¶14} Hyppolite raises the following assignments of error for our review:

I.   The trial court's findings of fact were against the manifest weight of the evidence.

II.   The trial court errored [sic] in its determination that the officer had reasonable suspicion to expand the scope of the traffic stop.

III.   The trial court errored [sic] in its determination to limit appellant's cross-examination of the arresting officer as to substantial compliance with the NHTSA manual.

IV.   The trial court errored [sic] in its determination that the administration of the field sobriety tests substantially complied with the NHTSA manual standards.

V.   The trial court erred in its determination that the arresting officer had probable cause to arrest the appellant for OVI.

**Law and Analysis**

**Standard of Review**

{¶15} This court reviews a decision on a suppression motion under a mixed standard of review. "In a motion to suppress, the trial court assumes the role of trier of fact and is in the best position to resolve questions of fact and evaluate witness credibility." *State v. Curry*, 95 Ohio App.3d 93, 96, 641 N.E.2d 1172 (8th Dist.1994). The reviewing court must accept the trial court's findings of fact in ruling on a motion to suppress if the findings are supported by competent, credible evidence. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8.   With respect to the

trial court's conclusion of law, the reviewing court applies a de novo standard of review and decides whether the facts satisfy the applicable legal standard. *Id.*, citing *State v. McNamara*, 124 Ohio App.3d 706, 707 N.E.2d 539 (4th Dist.1997).

**Trial Court's Finding Relative to Initial Encounter**

{¶16} In her first assignment of error, Hyppolite contends that the trial court's findings relative to Trooper Kay's initial encounter with her were not supported by competent, credible evidence and were "contrary to the clarifications and concessions made by Trooper Kay on cross-examination." Specifically, Hyppolite cites Trooper Kay's testimony in the defense's case that his police report did not indicate that he smelled an odor of alcohol prior to ordering Hyppolite out of her vehicle. She contrasts that testimony with the trial court's finding that the trooper detected the odor of alcohol prior to ordering Hyppolite out of her vehicle. Trooper Kay did testify on cross-examination that his report did not state that he smelled an odor of alcohol prior to ordering Hyppolite out of her vehicle. But he also testified that just because something is not in his report does not mean that it did not happen. He explained that his police report is not a "complete regurgitation of the traffic stop. It doesn't have every detail in there." Trooper Kay further testified that he remembered this traffic stop. Moreover, he never testified that he was mistaken about smelling the odor of alcohol coming from Hyppolite's car prior to ordering her out of it.

{¶17} As mentioned, the trial court "assumes the role of trier of fact and is in the best position to resolve questions of fact and evaluate witness credibility." *Curry*, 95

Ohio App.3d 93 at 96, 641 N.E.2d 1172 (8th Dist.1994). Based on Trooper Kay's testimony, there is nothing incredible about the trial court's finding that the trooper detected an odor of alcohol coming from Hyppolite's vehicle prior to ordering her out of the vehicle — the finding was supported by some competent, credible evidence.

{¶18} Hyppolite also challenges the trial court's finding that "[u]pon further investigation, the defendant stated that she had consumed tree shots of Crown Royal at [a] bar and that she was headed to her home in Elyria." Hyppolite again claims that the trial court found that the trooper learned this information prior to ordering Hyppolite out of her vehicle, but the trooper's testimony was that he learned it after Hyppolite was out of the vehicle.

{¶19} On this record, and for the purpose of resolving this assignment of error, we find the distinction as to when the trooper learned that Hyppolite had been drinking inconsequential. The trial court did not rely on Hyppolite's admission that she had been drinking as a ground to justify the expanded scope and duration of the stop.

{¶20} Rather, as to the extension of the scope and duration of the stop, the court found that upon his initial contact with Hyppolite, the trooper "detected an odor of alcohol coming from the vehicle. He observed the defendant to have glassy bloodshot eyes and slurred speech." The court went on to further find that "[w]hen the defendant produced a Florida driver's license, Kay requested the defendant to exit the vehicle and she complied. Specifically, Kay testified that he decided to conduct further investigation into whether or not the defendant was impaired based upon all of these things together."

**{¶21}** Nonetheless, the court's finding relative to Hyppolite's admission that she had been drinking was supported by competent, credible evidence: the trooper testified that when he asked Hyppolite if she had been drinking, she stated that she had "three shots of Crown Royal." But, in light of the above, whether the court found that the trooper learned of this before or after ordering Hyppolite out of the car is immaterial.

**{¶22}** The first assignment of error is overruled.

**Reasonable Suspicion to Expand Scope of Stop**

**{¶23}** In her second assignment of error, Hyppolite contends that the trial court erred in finding that Officer Kay had reasonable suspicion to expand the traffic stop. According to Hyppolite, "[b]ased on the [police] report and testimony provided by Trooper Kay, he only observed two clues of intoxication before asking appellant to exit her vehicle for field sobriety tests, which, based on the totality of the circumstances, was insufficient to justify a prolonged and expanded investigation." We disagree.

**{¶24}** It is well established that the scope and duration of a routine traffic stop "must be carefully tailored to its underlying justification * * * and last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); *see also State v. Gonyou*, 108 Ohio App.3d 369, 372, 670 N.E.2d 1040 (6th Dist.1995). The rule set forth in *Royer* is designed to prevent law enforcement officers from conducting "fishing expeditions" for evidence of a crime. *Sagamore Hills v. Eller*, 9th Dist. Summit No. 18495, 1997 Ohio App. LEXIS 4883,*12 (Nov. 5, 1997); *see also Fairborn v. Orrick*, 49 Ohio App.3d 94, 95, 550 N.E.2d 488 (2d

Dist.1988) (stating that the "mere fact that a police officer has an articulable and reasonable suspicion sufficient to stop a motor vehicle does not give that police officer 'open season' to investigate matters not reasonably within the scope of his suspicion").

{¶25} Thus, generally, "[w]hen a law enforcement officer stops a vehicle for a traffic violation, the officer may detain the motorist for a period of time sufficient to issue the motorist a citation and to perform routine procedures such as a computer check on the motorist's driver's license, registration and vehicle plates." *State v. Aguirre*, 4th Dist. Gallia No. 03CA5, 2003-Ohio-4909, ¶ 36; citing *State v. Carlson*, 102 Ohio App.3d 585, 598, 657 N.E.2d 591 (9th Dist.1995); *see also Rodriguez v. United States*, 575 U.S. _, 135 S.Ct. 1609, 1615, 191 L.Ed.2d 492 (2015).

{¶26} However, "[a]n officer may expand the scope of the stop and may continue to detain the vehicle without running afoul of the Fourth Amendment if the officer discovers further facts which give rise to a reasonable suspicion that additional criminal activity is afoot." *State v. Rose*, 4th Dist. Highland No. 06CA5, 2006-Ohio-5292, ¶ 17, citing *State v. Robinette*, 80 Ohio St.3d 234, 240, 685 N.E.2d 762 (1997). As the *Robinette* court explained,

> [w]hen a police officer's objective justification to continue detention of a person * * * is not related to the purpose of the original stop, and when that continued detention is not based on any articulable facts giving rise to a suspicion of some illegal activity justifying an extension of the detention, the continued detention to conduct a search constitutes an illegal seizure.

*Id.* at paragraph one of the syllabus.

{¶27} Conversely, "if a law enforcement officer, during a valid investigative stop,

ascertains 'reasonably articulable facts giving rise to a suspicion of criminal activity, the officer may then further detain and implement a more in-depth investigation of the individual.'" *Rose* at ¶ 17, quoting *Robinette* at 241.

{¶28} "In determining whether a detention is reasonable, the court must look at the totality of the circumstances." *State v. Matteucci*, 11th Dist. Lake No. 2001-L-205, 2003-Ohio-702, ¶ 30. The totality of the circumstances approach "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *State v. Ulmer*, 4th Dist. Scioto No. 09CA3283, 2010-Ohio-695, ¶ 23. Thus, when an appellate court reviews a police officer's reasonable suspicion determination, "the court must give due weight to factual inferences drawn by resident judges and local law enforcement officers." *Id.*

{¶29} In *Parma Hts. v. Dedejczyk*, 8th Dist. Cuyahoga No. 97664, 2012-Ohio-3458, this court held that an officer may request a motorist to perform field sobriety tests after a traffic stop for a minor traffic violation where the officer has articulable facts that give rise to reasonable suspicion that the motorist is intoxicated. *Id.* at ¶ 29.

{¶30} Trooper Kay testified as to the reasons he expanded the scope and duration of the stop. He specifically testified that it was based on the reason for the initial traffic stop, that is, Hyppolite's failure to exercise due care when passing his police cruiser; an odor of alcohol coming from inside the vehicle; Hyppolite's slow, slurred speech and

glassy bloodshot eyes; and her presentation of a Florida driver's license.

{¶31} On this record, the trooper had articulable facts that gave rise to reasonable suspicion that Hyppolite may have been intoxicated and, therefore, the extension of the scope and duration of the stop was proper. The second assignment of error is overruled.

**Cross-Examination of Trooper Kay**

{¶32} For her third assigned error, Hyppolite contends that the trial court abused its discretion by limiting her right to cross-examine Trooper Kay on the NHTSA manual's standards for the administration of field sobriety tests. Hyppolite also contends that the trial court abused its discretion by limiting her cross-examination as to the instructions he gave her while administering the field sobriety tests.

{¶33} The Sixth Amendment's right to confront witnesses guarantees a criminal defendant the right to cross-examine witnesses. *Columbus v. Miller*, 10th Dist. Franklin No. 89AP-111, 1989 Ohio App. LEXIS 3541, *18 (Sept. 12, 1989). A criminal defendant's right to confront and cross-examine a witness is not unlimited, however. *State v. Albanese*, 11th Dist. Portage No. 2005-P-0054, 2006-Ohio-4819, ¶ 56, citing *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986).

{¶34} The extent of cross-examination with respect to an appropriate subject of inquiry is within the sound discretion of the trial court. *State v. Green*, 66 Ohio St.3d 141, 147, 609 N.E.2d 1253 (1993). A trial court has considerable discretion to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation

that is repetitive or only marginally relevant. *State v. Treesh*, 90 Ohio St.3d 460, 480, 739 N.E.2d 749 (2001).

{¶35} On direct examination in the city's case, Trooper Kay testified about his training for the administration of field sobriety tests in accordance with the NHTSA standards. He testified that since his original training as to the standards, he has had yearly training, including "advanced roadside impaired driving training," which he explained "goes into more depth on standardized field sobriety tests." The trooper then testified as to his administration of the standardized tests on Hyppolite and how she performed. As mentioned, no NHTSA manual was introduced into evidence.

{¶36} As further mentioned, the defense did not cross-examine Trooper Kay during the city's case; rather, it called the trooper "as if on cross-examination" in its case. During that questioning, Trooper Kay testified that he had originally been trained on an earlier edition on the NHTSA manual, "probably" the 2006 edition. The defense then attempted to question him on portions of the 2006 manual. The city objected, "because the new standard is [set forth in the] 2013 [manual and] that's what [Trooper Kay] used in this stop." The court responded, "well, the fact of the matter is, just for the record, this is 2015. The officer testified that he was trained on [the] most recent manual. I'm not sure what the relevancy of the 2006 manual is at this point. Can you tell me why we need to go over that?"

{¶37} The defense responded that it wanted to question the trooper using the 2006 manual because that was the one he (the trooper) had been trained on. The court

responded that the problem with that was Trooper Kay had had subsequent training every year since 2006, and asked counsel "are you saying you don't have a copy of the 2013 manual because you're using the 2006 manual?"   Counsel responded, "Yeah.   That's it exactly."

{¶38} The court then instructed counsel as follows:   "Let's just do that then.   Just clarify that you're reading from the 2006 manual and that * * * you're understanding is that it's the same as the most recent manual, if that's true."   Counsel agreed, stating, "Okay. Yeah.   I won't be long on this point."

{¶39} Counsel then handed Trooper Kay a page of the 2006 manual and asked him if he recognized it and was familiar with it.   The trooper responded, " I mean, I — I may have seen this before.   I don't really recall.   It doesn't really have too much in it."   The city objected, contending that the manual is an "enormous book.   He's showing him * * * an isolated page."   The court sustained the objection and told defense counsel that if there was a point that he wanted to make relative to the NHTSA manual, he could ask the city to stipulate to what the manual says, "but we're not going to sit here while the officer goes through the NHTSA manual page by page."   Defense counsel then went on to question the trooper regarding the NHTSA standards generally, without specific reference to the manual.

{¶40} Upon review, the trial court did not abuse its discretion by not permitting the defense to question Trooper Kay on single page copies of an outdated NHTSA manual. The record demonstrates that the defense was still able to effectively cross-examine

Trooper Kay about the NHTSA requirements, and Hyppolite's Sixth Amendment rights were not violated.

{¶41} We likewise find no abuse of discretion in the trial court's limitation of Hyppolite's cross-examination of the trooper with regard to the instructions he gave her while administering the field sobriety tests. In this instance, defense counsel sought to play the instructions as recorded on the dashboard camera video "one by one" and ask Trooper Kay what he said. The trial court asked counsel for his reasoning for seeking to do this, given that the video had already been played and the trooper had already testified on direct examination about the instructions given in light of the NHTSA standards.

{¶42} In response, counsel told the court that the instructions Trooper Kay had given did not match the instructions in the 2006 NHTSA manual. The city interjected that there was no NHTSA manual in evidence, and therefore defense counsel was "testifying" as to what the manual stated. The court stated that it would not limit counsel's questioning about his administration of the standardized tests to Hyppolite, but that counsel's attempt to compare what the trooper did vis-a-vis the NHTSA manual, which was not in evidence, was improper. The court further told counsel that playing the video was cumulative, because it had already been played by the city during its case and the court intended to watch it again during its deliberations. Defense counsel conceded, agreeing that the video "speaks for itself."

{¶43} There was no abuse of discretion on this record. The court was within its discretion to limit counsel's questioning to how the trooper administered the tests,

without specific references to the NHTSA manual, which was not in evidence. The court was likewise within its discretion to limit repetitive evidence, that is, the re-playing of the entire dashboard camera video; even with the limitation, counsel was still able to effectively cross-examine Trooper Kay.

**{¶44}** For example, the defense was able to elicit testimony from the trooper that, according to the defense's calculations, he administered the HGN test to Hyppolite in approximately half of the time recommended in the NHTSA manual. The defense also elicited testimony from Trooper Kay that the alphabet test is not a standardized test, and it is generally done prior to ordering a suspect out of a car rather than after, as he had done in this case.

**{¶45}** In light of the above, the third assignment of error is overruled.

**Substantial Compliance with NHTSA Standards**

**{¶46}** For her fourth assignment of error, Hyppolite contends that the trial court erred in finding that Trooper Kay substantially complied with the NHTSA standards.

**{¶47}** Under R.C. 4511.19(D)(4)(b), an officer may testify "concerning the results of the field sobriety test" if the officer administered the test in "substantial compliance" with the testing standards. Thus, in order for the results of the field sobriety tests to be admissible, the city must demonstrate by clear and convincing evidence that the officer performing the testing substantially complied with accepted testing standards. *Middleburg Hts. v. Gettings*, 8th Dist. Cuyahoga No. 99556, 2013-Ohio-3536, ¶ 12; *Dedejczyk*, 8th Dist. Cuyahoga No. 97664, 2012-Ohio-3458 at ¶ 42. The city may demonstrate what the

NHTSA standards are through competent testimony and/or by introducing the applicable portions of the NHTSA manual. *State v. Boczar*, 113 Ohio St.3d 148, 2007-Ohio-1251, 863 N.E.2d 155, ¶ 28; *State v. Reddington*, 9th Dist. Medina No. 14CA0064-M, 2015-Ohio-2890, ¶ 19.

{¶48} Substantial compliance is not defined in R.C. 4511.19(D)(4)(b); it is "obviously less than strict compliance, but how much less? Since the term is not legislatively defined, courts are apparently left with some discretion to determine the substantiality of the compliance." *State v. Perry*, 129 Ohio Misc. 61, 2004-Ohio-7332, 822 N.E.2d 862, ¶ 45. Because the statute does not define substantial compliance, this court makes a determination of whether the facts satisfy the standard on a case-by-case basis. *Brookpark v. Key*, 8th Dist. Cuyahoga No. 89612, 2008-Ohio-1811,¶ 52, citing *State v. Mapes*, 6th Dist. Fulton No. F-04-031, 2005-Ohio-3359.

{¶49} Upon review, we find that Trooper Kay provided competent testimony as to what the NHTSA standards were. At the start of the suppression hearing, the defense stipulated to the trooper's training and experience. Trooper Kay elaborated on his training, testifying that he takes yearly update classes through the Ohio State Highway Patrol, and the classes included advanced roadside impaired driver training that goes in depth about field sobriety testing.

{¶50} Trooper Kay testified that he was familiar with the NHTSA standards, and he testified about them for each of the tests he administered. We are not persuaded by Hyppolite's contention that the trooper did not substantially comply with the standards

because he (1) administered the HGN test in less than the recommended time, (2) did not use the exact language from the NHTSA manual in instructing her, or (3) instructed her slightly out of order.

{¶51} In regard to the HGN test, although the trooper admitted that, according to the defense's calculations, he may have conducted the test in a shorter period of time than suggested in the manual, he explained that, for officer safety, he does not stand on the side of the road/highway with the manual, a "cheat sheet," or a stop watch.   Rather, he conducts the test as he had been trained to do, first inquiring of the driver as to whether he or she has any eye issues or wears glasses or contact lenses.   He then has the driver face forward and look at a stimulus so that he can establish "resting nystagmus."   Trooper Kay further testified as to the NHTSA standards for each phase of the testing and indicated that Hyppolite exhibited all six of the possible clues.

{¶52} The trooper also testified as to the NHTSA standards for the walk and turn test.   Although Hyppolite contends that Trooper Kay failed to instruct her to "place her left foot on the line," the trooper can be heard on the dashboard camera video instructing her to "place her right foot in front of left foot touching heel to toe."   Hyppolite further contends that Trooper Kay instructed her out of order and failed to ask if she understood the instructions.   A review of the dashboard camera video reveals that he did ask her if she understood, and requiring that he instruct her exactly sequentially as set forth in the manual would be requiring strict, rather than substantial, compliance.

{¶53} In regard to the one leg stand test, Trooper Kay testified as to the standard

way the test is administered, the clues that he is trained to observe, and the clues that Hyppolite presented. Hyppolite contends, however, that the trooper failed to tell her to look at her right foot and failed to ask her whether she understood the directions. A review of the dashboard camera video reveals substantial compliance: Trooper Kay instructed Hyppolite to "raise her foot, keep it flat and parallel, and look at it the entire time," and he did ask Hyppolite whether she understood the directions.

**{¶54}** In sum, Hyppolite stipulated to Trooper Kay's training and experience. He testified about the standards for each of the NHTSA tests he performed and how Hyppolite performed on these tests. Although the NHTSA manual was not entered into evidence, that is but one way of determining what the standards are — another way is by presenting competent testimony about them. On this record, we find that Trooper Kay's testimony about the standards was competent and established that he substantially complied with them.

**{¶55}** The fourth assignment of error is overruled.

**Probable Cause to Arrest**

**{¶56}** For her final assigned error, Hyppolite contends that the trial court improperly found that Trooper Kay had probable cause to arrest her for OVI. We disagree.

**{¶57}** Probable cause to arrest exists when an officer is aware of facts that would lead a reasonable person to believe that the suspect has committed or is committing a crime. *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964). In the

OVI context, courts must determine whether, "at the moment of the arrest, the police had sufficient information, derived from a reasonably trustworthy source of facts and circumstances, sufficient to cause a prudent person to believe that the suspect was driving under the influence." *State v. Homan*, 89 Ohio St.3d 421, 427, 732 N.E.2d 952 (2000), *superseded by statute on other grounds*.

{¶58} Upon review, there were sufficient facts that would have caused a prudent person to believe that Hyppolite was driving under the influence of alcohol. The trooper testified that in his interaction with Hyppolite to investigate the traffic violation, he observed that her eyes were bloodshot and glassy, and her speech was slow and slurred. He also testified that he smelled an odor of alcoholic beverage coming from inside the vehicle. Further, upon his initial encounter with Hyppolite, she was looking down, while her passenger was doing all the talking.

{¶59} When asked if she had been drinking, Hyppolite stated that she had had three shots of Crown Royal. Hyppolite's impairment was indicated on all three of the standardized field sobriety tests Trooper Kay administered, as well as on the nonstandardized alphabet test. On this record, Trooper Kay had probable cause to arrest Hyppolite.

{¶60} The fifth assignment of error is overruled.

{¶61} Judgment affirmed; case remanded to the trial court for execution of sentence.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the Cleveland Municipal Court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

LARRY A. JONES, SR., ADMINISTRATIVE JUDGE

EILEEN A. GALLAGHER, J., and
MELODY J. STEWART, J., CONCUR

KEYWORDS:
#103955

Motion to suppress; manifest weight; traffic stop; field sobriety tests; probable cause; R.C. 4511.19(D)(4)(b)/officer testimony on field sobriety tests; substantial compliance. The officer smelled an odor of alcohol coming from appellant's vehicle thus furthering the officer's scope of the stop. The trial court was in the best position to resolve questions of fact and evaluate witness credibility. The trial court's findings were not against the manifest weight of the evidence. The officer had articulable facts that gave rise to an extension of the scope and duration of the stop. The trial court did not err in its determination that the officer had reasonable suspicion to expand the scope of the traffic stop. The trial court was within its discretion in limiting defense counsel's questioning of the officer as to how he administered the NHTSA field sobriety tests. The officer's testimony about the NHTSA standards was competent and he substantially complied with them. There was no abuse of discretion committed by the trial court. The officer observed that appellant's eyes were bloodshot and glassy; her speech was slow and slurred; the officer smelled the odor of alcohol coming from the vehicle; and appellant showed impairment on all three of the standardized field sobriety tests. Sufficient facts existed to give the officer probable cause to arrest.